**UNITED STATES of America,**

v.

**Joseph SELUK, Defendant.**

**Crim. No. 88–107–K.**

United States District Court,
D. Massachusetts.

July 5, 1988.

Robert Richman, Federal Defender's Office, Boston, Mass., for defendant.

Victor A. Wild, Boston, Mass., for U.S.

## OPINION

KEETON, District Judge.

The defendant, scheduled to be sentenced under mandatory sentencing guidelines promulgated by the United States Sentencing Commission pursuant to the Sentencing Reform Act ("SRA" or "the Act"), 28 U.S. C. § 991 *et seq.*, challenges the constitutionality of the Act and the guidelines as a whole. I conclude that the challenge lacks merit.

The defendant has not challenged separately any of the particular provisions that bear upon his sentence, and of course, I do not consider whether one or more among the many provisions within the guidelines may be held unconstitutional as applied in other circumstances, even though the guidelines as a whole survive challenge.

### I. *Summary of Contentions*

The defendant contends that the creation of the Sentencing Commission, pursuant to the SRA, violates the Constitution in five ways. The first four are arguments that the SRA violates the doctrine of separation of powers because (1) through this Act Congress has assigned legislative power to a body (the Sentencing Commission) that not only is outside the legislative branch but also is part of the judicial branch, (2) the SRA makes an excessive delegation of legislative power, (3) the inclusion of three federal judges on the Commission threatens the independence and impartiality of the judiciary, and (4) the President's control over the Commission makes its members

(including judges) subservient to the executive branch. The final argument is that (5) the sentencing guidelines deny due process by unduly restricting defendants' right to present information relevant to sentencing.

■ Essentially similar arguments, though with variations in detail, were presented to and rejected by Judge Mazzone in *United States v. Alves,* 688 F.Supp. 70 (D.Mass.1988), and a number of other district courts, *see, e.g., United States v. Johnson,* 682 F.Supp. 1033 (W.D.Mo.), *cert. granted sub nom. United States v. Mistretta,* — U.S. ——, 108 S.Ct. 2818, 100 L.Ed.2d 920 (1988); *United States v. Chambless,* 680 F.Supp. 793 (E.D.La.1988); *United States v. Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal.1988). Decisions of other courts, even greater in number, sustained the challenge to constitutionality. *See, e.g., United States v. Tolbert,* 682 F.Supp. 1517 (D.Kan.1988); *United States v. Estrada,* 680 F.Supp. 1312 (D.Minn. 1988); *United States v. Frank,* 682 F.Supp. 815 (W.D.Pa.1988); *United States v. Arnold,* 678 F.Supp. 1463 (S.D.Cal.1988). I concur in the conclusions reached by Judge Mazzone in *Alves,* the only other case thus far decided in this district, and I write further only to consider the basic premises of the separation-of-powers and due-process arguments emphasized in the submissions before me and to address some points not explicitly addressed in the *Alves* opinion and others cited above as sustaining the SRA.

Underlying the first and second of the defendant's contentions is the characterization of the Commission's power to develop sentencing guidelines as a "legislative" power. This characterization is the foundation for contentions that the power may not be exercised by either the executive or the judicial branch of government, that the delegation made by Congress in this case is constitutionally excessive, and that, therefore, delegation to a commission placed in the judicial branch is twice forbidden—both because of the extent of the delegation and because the SRA attempts to delegate to a commission that it purports to place in the judicial branch.

In response, first, the government argues that fashioning sentencing guidelines is essentially "executing" law rather than "making" law, and is analogous to the function previously performed by the Parole Commission, which served the objective of reducing disparity in sentences entered by hundreds of different judges by applying guidelines that it developed for general use and then applied case by case. Second, the Commission responds that governmental entities in the judicial branch, as well as administrative agencies (whether treated as part of the executive branch or as "independent" agencies) have an acknowledged power to promulgate rules affecting their administration, procedures, and operations, and that the sentencing guidelines developed by the Commission and challenged here are constitutionally permissible under this inherent rulemaking power. As to placement of the Commission in the judicial branch, the government does not oppose a ruling that this is impermissible but argues that this provision is severable. Counsel for the Commission, as amicus, defends the placement of the Commission in the judicial branch as well as all other features of the Act.

In order to assess the defense contentions and the responses of the government and the Commission, one must consider what is the most appropriate description of the nature of the function of fashioning sentencing guidelines such as those promulgated by the Commission and to what extent this function is like or unlike powers traditionally exercised in various branches of government, including agencies unknown in earlier years of our constitutional history but used with increasing profusion and variety in the last half century.

## II. *"Legislative," "Rulemaking," and "Lawmaking" Powers*

At the outset, it may be observed that advocates of contrasting views predictably use different terminology with contrasting tendencies as hidden persuaders. Characterizing the power to develop sentencing guidelines as a "legislative" power encourages one to conclude that this power belongs only in the legislative branch. Sim-

ilarly, on the other side, characterizing this power as a "rulemaking" power encourages one to conclude that it is an inherent power of every court, administrative agency, and commission.

Accepting such an intuitive leap from a label adopted without examination of its substantive implications, however, is precisely the kind of formalism in applying the doctrine of separation of powers that the Supreme Court has rejected. *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977); *Buckely v. Valeo,* 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) (per curiam); *see also Morrison v. Olson,* — U.S. —, 108 S.Ct. 2597, 2617–19, 101 L.Ed.2d 569. Fidelity to the Court's caution against formalism requires an appraisal of the reality of how powers and functions have been allocated and exercised among the three branches in the system that had evolved up to the time of enactment of the SRA, as well as how they are allocated and will be exercised under the Act.

Defendant characterizes the Commission's work as nonjudicial. Citing *Hayburn's Case,* 2 U.S. (2 Dall.) 409 (1792), and *United States v. Ferreira,* 54 U.S. (13 How.) 40, 52, 14 L.Ed. 40 (1852), defendant argues that the Supreme Court has recently explained these early cases as holding "that executive or administrative duties of a nonjudicial nature may not be imposed on [Article III] judges." *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976). Defendant also calls attention to the declaration in *Springer v. Phillipine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928), that "unless otherwise expressly provided or incidental to the powers conferred, ... the judiciary cannot exercise either executive or legislative power." *Id.* at 201–02, 48 S.Ct. at 482; *see also Keller v. Potomac Electric Power Co.,* 261 U.S. 428, 444, 43 S.Ct. 445, 449, 67 L.Ed. 731 (1923) (declaring legislation prescribing legislative function for Supreme Court invalid).

The defense argument continues that under Article III, Section 2, of the Constitution, the power of judges is narrowly and precisely limited to deciding cases and controversies. *See Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923); *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

If interpreted in this restrictive way, however, these precedents would invalidate much of the traditional work of Article III judges. Indeed, defendant has recognized that judicial officers (including Article III judges) are not limited to performing the adjudicatory function of deciding cases and controversies. Their acknowledged powers and duties of office include nonadjudicatory tasks. Among such functions are disciplinary supervision of both Bench and Bar, rulemaking "ancillary to the administration of the courts," *In re Certain Complaints Under Investigation,* 783 F.2d 1488, 1505 (11th Cir.), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986), and other functions, including supervision of grand juries and initiation of contempt proceedings, that "do not necessarily or directly involve adversarial proceedings within a trial or appellate court," *Morrison,* 108 S.Ct. 2597 at 2614 n. 20.

Defendant argues, however, that the judiciary may not "take part in the formulation of substantive law. *See Sibbach v. Wilson & Co.,* 312 U.S. 1, 14 [61 S.Ct. 422, 426, 85 L.Ed. 479] (1941)." Defense Memorandum (Docket No. 13), page 9.

This broad assertion that courts and Article III judges may not "take part in the formulation of substantive law" is a vulnerable link in the defense chain of reasoning.

The premise that courts may engage in prospective "procedural" rulemaking but never in prospective "substantive" rulemaking not only is inconsistent with American legal tradition but also is flawed on theoretical grounds.

True, there was a time when prevailing legal theory suppressed the fact that courts make law. Among the grandest of all legal fictions was the notion that courts merely interpret and apply law either previously made by statute or simply existing as a "brooding omnipresence" in the absence

of any statute in point. For at least a half century now, however, a more candid view of legal process has prevailed. Courts regularly "take part in the formulation of substantive law" in a variety of ways. First and most notably, they do so daily by making decisions that, under the common law system, are precedents. Of course, one might describe as *retroactive* the kind of lawmaking that is incident to recognition of judicial decisions as precedents; however, the law thus made not only determines the legal consequences of the past events involved in the case before the court but also is controlling, as precedent, over past events involved in cases yet to be decided as well as future events.

Subtler, perhaps, but even more influential as a factor in *prospective* lawmaking, is the court's duty (and not merely authority) to disclose reasons for its judgments. A candid disclosure of reasons inevitably says more about what law will be applied in future cases than need be said to decide the case at hand if the court were willing to state a reason of narrower scope than the more broadly applicable reason that did in fact influence the court to decide as it did.

Even today, as well as in time past, a common way of describing the lawmaking that occurs in judicial opinions—perhaps even the most common way of describing it—maintains formally the legal fiction that courts "find" law and do not "make" it. Thus, it is said that when a court decides one way first and later overrules that decision and applies the newly recognized substantive rule retroactively, the court did not "make" either the "old" or the "new" rule. Rather in its later decision the court "found" what the law had been all along, though for a time it had been incorrectly perceived. *Cf. Venturelli v. Cincinnati, Inc.*, 850 F.2d 825, 828 (1st Cir.1988) (applying recent product liability precedents retroactively to the manufacturing in 1947 of industrial machinery that contributed to an injury in 1981; "courts typically apply newer understandings of 'old' legal standards to 'old' sets of facts"; "they normally treat law as 'found,' not 'made' "). Nevertheless, in exceptional circumstances overruling decisions are given prospective effect *only* and are not even applied to the case before the court. *See, e.g., Great Northern Ry. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 363–66, 53 S.Ct. 145, 148–49, 77 L.Ed. 360 (1932). Somewhat more frequently, overruling decisions are given prospective effect *principally;* that is, the newly-fashioned rule is applied to the case before the court, and thus retroactively as to that one past set of events, but otherwise is applied prospectively only. *See, e.g., Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) (declining to apply the rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which overruled *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), to other cases finally decided before *Mapp* ). Both *Sunburst* (in a civil context) and *Mapp–Linkletter* (in a criminal context) are illustrations of lawmaking with respect to issues that incontrovertibly had substantive impact. Also, the types of decisionmaking they illustrate are prospective substantive lawmaking not only in practical effect but in form as well.

Other illustrations of prospective lawmaking involve the fashioning of "supervisory rules" that might be distinguished as procedural rather than substantive. *See, e.g., Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90 (3d Cir.1988) (vacating sanctions award under Fed.R.Civ.P. 11; adopting "as a supervisory rule" a requirement that all motions for Rule 11 sanctions be filed in the district court before the entry of a final judgment). Even decisions involving exercise of a court's supervisory powers, however, demonstrate that judicial power to make law is not limited to making law coincidentally, under the doctrine of *stare decisis*, by deciding a case or controversy. Rules of procedure are rules of law—even if strictly procedural law rather than substantive law.

Moreover, along the spectrum from what is incontrovertibly substantive to what is incontrovertibly procedural, more distinctions have been drawn in precedents and in practice than simply one bright line dividing the universe of instances into two

groups, one totally substantive in nature and the other totally procedural. Different definitions of substantive-procedural distinctions have been fashioned to serve the different objectives relevant to different contexts. *See, e.g., Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed. 2d 8 (1965); *Sibbach,* 312 U.S. at 9–14, 61 S.Ct. at 424–27.

Also, even among different contexts in which it is agreed that rulemaking is substantive rather than procedural, the particular nature and function of the substantive rulemaking bears upon the extent to which it is constitutionally permissible for substantive lawmaking to occur outside the legislative branch. The law of criminal sentencing is among the clearest historical examples of a field in which much substantive lawmaking did occur, before enactment of the SRA, in the courts and, through the work of the Parole Commission, in the executive branch.

All three branches of government have long exercised significant powers over the scope and extent of punishment of persons convicted of crimes. Indeed, one of the explicit premises of enactment of the SRA was that the meaning of a sentence declared by a judge (within the very loose constraints imposed by Congress, despite its acknowledged power to enact more rigorous limitations upon sentencing range) had been obscured by the power of the Parole Commission to release a prisoner after he or she had served only a small part of the period of confinement announced as the judge's sentence. Thus, Congress, courts, and the Parole Commission have substantially shared control in fact over the punishment imposed upon each individual defendant. *See Geraghty v. United States Parole Comm'n,* 719 F.2d 1199, 1211 (3d Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984).

I do not rest my judgment upon either (1) the assertion that fashioning sentencing guidelines is essentially "executing" law rather than "making" law, or (2) the assertion that fashioning sentencing guidelines is no more than an exercise of inherent "rulemaking" power. To accept either of those contentions would be at least problematic, and probably incorrect. *Cf. Estrada,* 680 F.Supp. at 1327–29 (holding that the guidelines are substantive and—contrary to the conclusion I have reached—for that reason are unconstitutional). I conclude that in any event it would be inappropriate to accept those contentions in view of the Supreme Court's caution against formalism in analysis of separation-of-powers issues.

I accept as reality that the work of the Sentencing Commission is in essence prospective substantive lawmaking because it is developing guidelines for application in the future to reasoned rather than purely discretionary sentencing decisions. This reality, however, is not dispositive of the separation-of-powers challenge. In order to decide whether participation of Article III judges in the kind of lawmaking that is involved in the work of the Sentencing Commission is forbidden by separation-of-powers principles, we must examine more closely both the nature of this lawmaking and how it compares with other developments in our constitutional tradition.

### III. *Incomplete Substantive Lawmaking and Delegation*

The SRA very sharply curtailed the executive branch's discretion as to length of the sentence of an individual offender by abolishing the Parole Commission. Also, it substantially reduced the exercise of discretion case by case in the judicial branch. These choices by Congress are choices to enact a law that affects the severity of punishment for crime in a deeper way than merely setting statutory minimum and maximum terms of imprisonment. The SRA imposes much greater substantive constraints on the discretion of judges and others. The imposition of these substantive-law constraints upon individual sentencing decisions is lawmaking that is well within the scope of Congress' legislative power unless the method Congress chose to implement them is forbidden. One of the defense challenges to the method centers on the incompleteness of the congressional mandate. That is, the defense argues that the new substantive law enacted in the

SRA is so incomplete (and thus depends so much on further lawmaking by other branches) that it offends constitutional constraints.

The Constitution, however, does not require that any statute be a complete prescription for the area of law it addresses. By necessity, because of the limitations of human foresight, and not merely by choice, every lawmaking pronouncement by every entity that makes law is an incomplete statement of the law on the subject addressed. No precedent, no rule, and no statute ever answers all substantive law questions related to the subject matter it addresses. All lawmaking—whether by Congress, by courts, or by other governmental entities—is to some degree left to further development.

In part, further development occurs as the law is applied case by case. This is an inherent characteristic of the common law system in which each decision becomes precedent.

In part also, however, further development occurs in other ways. One set of examples, noted in Part II above, appears in judicial decisions that overrule precedent prospectively only, not retroactively even as to the case before the court. *See, e.g., Sunburst,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). It may be observed that what the court declares in such instances about the future is not said in deciding the case or controversy then before the court. Nevertheless, the declaration about the future is, as a practical matter, effective lawmaking.

A second set of examples appears in developments that follow a congressional authorization for agency development of "regulations" that have substantive and not merely procedural consequence. One striking instance is a regulation of the Environmental Protection Agency, in relation to a matter to which expert knowledge and perception of the agency was relevant. A regulation of the agency was treated, both in essence and in legal theory, as having substantive-law effect and with the consequence that courts must defer to the agency's way of filling a gap in the statutory

lawmaking. As the Court stated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> If ... the court determines [that in enacting a statute] Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> "The power of an administrative agency to administer a congressionally created ... program requires the formulation of policy and the *making of rules to fill any gap left,* implicitly or explicitly, by Congress." *Morton v. Ruiz,* 415 U.S. 199, 231 [94 S.Ct. 1055, 1072, 39 L.Ed.2d 270] (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.

*Id.* at 843–44, 104 S.Ct. at 2782 (footnotes omitted) (emphasis added).

The functioning of the Parole Commission during recent decades may be considered an even more dramatic and relevant illustration of congressional authorization for agency (in this instance, an agency in the executive branch) development of rules or regulations with substantive impact—impact over the length of the deprivation of liberty in individual cases. That is, by a process that occurred apart from its making decisions on individual applications for parole, the Parole Commission developed "guidelines" for its parole decisions. Then, in deciding upon individual applications presented after those guidelines were in place, it generated "precedents" (though in a sense less precise and constraining than judicial precedents).

In upholding the statute authorizing the Parole Commission's fashioning of parole guidelines for prospective application, the Third Circuit observed:

Yet, even if the statute could be construed as delegating some legislative power to the Commission, we think that compared to other administrative law precedents it withstands constitutional attack. Courts have consistently upheld much more expansive delegations of authority to agencies to regulate the conduct of members of the public. *See, e.g., Yakus v. United States,* 321 U.S. 414 [64 S.Ct. 660, 88 L.Ed. 834] (1944) (price controls imposed under Emergency Price Control Act of 1942); *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381 [60 S.Ct. 907, 84 L.Ed. 1263] (1940) (sales tax imposed under Bituminous Coal Conservation Act); *United States v. Gordon,* 580 F.2d 827 (5th Cir.), *cert. denied,* 439 U.S. 1051 [99 S.Ct. 731, 58 L.Ed.2d 711] (1978) (drug control standards established by the Comprehensive Drug Abuse Prevention and Control Act). In fact, the Supreme Court has declared statutes unconstitutional on the basis of an improper delegation of a legislative function on only two occasions. *See Schechter Poultry Corp. v. United States,* 295 U.S. 495 [55 S.Ct. 837, 79 L.Ed. 1570] (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388 [55 S.Ct. 241, 79 L.Ed. 446] (1935).

*Geraghty,* 719 F.2d at 1212–13.

■ Defendant's argument that the SRA attempts an unconstitutional delegation of "legislative" power, formal though the argument is, cannot be dismissed lightly. Indeed, it derives from the language of the Constitution.

All *legislative* Powers herein granted shall be vested in a *Congress* of the United States, which shall consist of a Senate and House of Representatives.

Art. I, § 1 (emphasis added). Interpreting this section of the Constitution as totally prohibiting participation of executive and judicial officials in lawmaking, however, would be disregarding the provisions of Article I, § 7, under which no enactment by Congress becomes law before it is presented to the President and either approved by him or disapproved by him and repassed by two-thirds of the Senate and House. Moreover, the third branch, exercising the con-

stitutional power of judicial review, also has a lawmaking role in determining whether a statute enacted by Congress and approved by the President is enforceable in cases and controversies before the courts. Thus, the Constitution as a whole does not support the argument that all lawmaking functions are a part of the "legislative Powers" vested exclusively in Congress.

Neither the text of the Constitution nor the opinions construing it may properly be understood as supporting the argument that the label "legislative," in the Article I, § 1 sense, is aptly applied to all actions of courts and agencies in filling the interstices of constitutionally permissible statutory initiatives. This conclusion is supported by a close examination of what was said and done by the Court in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

The government has cited *Chadha* in support of the contention that the work of the Sentencing Commission in fashioning guidelines is "executive" because it is merely a part of "executing" the laws on criminal sentencing enacted by Congress. As already noted, I reject that contention and recognize that fashioning sentencing guidelines is lawmaking. Nevertheless, when the Court in *Chadha* referred to the Attorney General's "exercise of legislatively delegated authority," *id.* at 952–53, 103 S.Ct. at 2785, it was not using "legislative" in a sense limited to the Article I, § 1 sense of exercise of a power that only Congress can exercise. If "legislative" were used in a sense limited to the exercise of *"Powers"* that only Congress could exercise, Congress could not delegate any "legislative" authority and all purported "legislatively delegated authority" would be forbidden.

The conclusion that the Court, in *Chadha,* was not using "legislative" in such a narrow sense is reinforced by attention to the nature of the issue before the Court in that case. The decision of the Court was that a "one-House veto" was unconstitutional. The Court observed:

The Constitution sought to divide the delegated powers of the new Federal Government into three defined catego-

ries, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.

*Id.* at 951, 103 S.Ct. at 2784. A footnote in *Chadha* responded to the contention of Congress that affirming the Court of Appeals decision against the one-House veto "will sanction 'lawmaking by the Attorney General....'" *Id.* at 953 n. 16, 103 S.Ct. at 2785 n. 16. "Why," the brief presenting the contention of Congress asked, "is the Attorney General exempt from submitting his proposed changes in the law to the full bicameral process?" *Id.* It was in this context that the Court quoted the observation that "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker," *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952), and added that "[w]hen the Attorney General performs his duties ... he does not exercise 'legislative' power." *Chadha,* 462 U.S. at 953 n. 16, 103 S.Ct. at 2785 n. 16. The footnote concludes:

> Executive action under legislatively delegated authority that might resemble "legislative" action in some respects is not subject to the approval of both Houses of Congress and the President for the reason that the Constitution does not so require. That kind of Executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely. A one-House veto is clearly legislative in both character and effect and is not so checked; the need for the check provided by Art. I, §§ 1, 7, is therefore clear. *Congress' authority to delegate portions of its power* to administrative agencies provides no support for the argument that Congress can consti-

tutionally control administration of the laws by way of a congressional veto. *Chadha,* 462 U.S. at 953–54 n. 16, 103 S.Ct. at 2785 n. 16 (emphasis added).

Two points are to be underscored. First, the Court treats recognized examples of "legislatively delegated authority" as instances of Congress' authorized delegation of "portions of its power." Whether we should call the exercise of that delegated power "legislative" action (as defendant might assert) or "executive" action (as the government asserts), or should describe it in some other way, may surely be debated. In no event, however, can it be denied that the delegation of a portion of Congress' power and the exercise of that power are things the Court has determined to be constitutionally permissible. The second point to be underscored, because of its bearing upon the relevance of *Chadha* to issues in the present case, is that the provision struck down in *Chadha* would have disturbed the balance of powers because of the absence of the "check" explicitly provided in two sections of Article I of the Constitution. In the present case, no comparable or analogous disturbance by the SRA of the constitutionally declared balance of powers has been identified.

The force of any contention that *Chadha* is precedent against the constitutionality of the SRA depends on the assertion that all "lawmaking" is an exercise of "legislative" power and that *Chadha* condemns "lawmaking" by any branch other than Congress. To read *Chadha* in this way, however, would be to disregard the Court's explicit recognition of "Congress' authority to delegate portions of its power," *id.,* as it regularly does when it chooses to enact a statute establishing legal rules that are quite general and leaves to other branches the task of completing the lawmaking thus initiated.

The conclusion reached here is supported also by the Court's emphasis, in *Morrison,* not upon "characterization" of the functions of an agency but upon "the real question" as to whether one branch is given a power that impedes another branch's abili-

ty to perform its constitutional duty. 108 S.Ct. 2597, 2622.

With the foregoing generalizations about incomplete substantive lawmaking as background, I turn next to a closer examination of the kind of lawmaking that the SRA has initiated.

## IV. *Distinctive Characteristics of Lawmaking by the Sentencing Commission*

Given the great freedom Congress has with respect to how it informs itself about all matters relevant to pending proposals for legislation, I conclude that Congress might have chosen to create a commission to study the problems of criminal sentencing and to propose sentencing guidelines. Congress might then have enacted guidelines generally like those that have been promulgated by the Sentencing Commission pursuant to the SRA. In reaching this conclusion, I have not considered and need not consider whether one or another among many details of the guidelines may be subject to challenge on other grounds beyond those addressed in this Opinion. The case before me presents no such challenge to any particular guideline. Instead, the defense challenge is to the guidelines as a whole.

The issue now to be addressed is whether Congress, rather than itself enacting sentencing guidelines, and from time to time amending them as needs for amendment become apparent, may instead create a commission (and the particular form of commission created by the SRA) to perform this function, subject always to congressional intervention should Congress choose to override, for the future at least, some part or all of the Commission's lawmaking through development and amendment of sentencing guidelines.

The general acceptance and apparent assumption of constitutionality of the functioning of the Parole Commission in recent decades is again relevant. That has been an instance in which Congress chose to enact a statute which has been treated as authorizing a commission (in the executive branch) to develop guidelines and amend them from time to time, and as well to apply them decisionally ("adjudicatively," one might say) case by case. Those guidelines were not *in form* constraints upon the exercise of discretion by judges in individual sentencing decisions, but *in substance* they did effect very deep constraints. For example, when a judge had determined that a sentence of confinement for ten years was appropriate, the Parole Commission could drastically alter the substantive effect of that sentence by releasing the prisoner on parole after only a third of the time had been served.

Thus, the power of the Parole Commission to fashion guidelines with such deep substantive impact was a power of lawmaking to fill interstices of the incomplete lawmaking of Congress. The statutes prescribed some firm constraints (such as maximum limits on sentences for particular offenses) upon the discretion of courts and of the Parole Commission, but left courts free to exercise very substantial discretion in individual sentencing decisions. Also, the statutes left courts free to perform the function of interstitial lawmaking in construing the statutes and to some limited extent in fashioning rules such as those developed in the small body of appellate decisions regarding sentencing. Finally, the statutes left to the Parole Commission (by "delegation," if one chooses that characterization) both an additional lawmaking function in developing guidelines and an additional decisional function (with potential precedential effect) in applying them case by case. The set of lawmaking functions of the Parole Commission was less extensive than the lawmaking function of the Sentencing Commission under the SRA, but they are nevertheless analogous in nature.

Our constitutional history includes many illustrations in which the function of further lawmaking of such extensive scope as that involved here has been left to courts, rather than to agencies or commissions. Illustrative are the very generalized standards prescribed in antitrust legislation, which left courts to develop the more precise meaning of the standards. *See, e.g.,* I Areeda & Turner, *Antitrust Law* para. 106

(1978) ("Inexplicit Statutes and Unilluminating Legislative History").

I conclude that the delegation of a lawmaking function to the Sentencing Commission presents a debatable issue of first impression because in no previous instance has Congress made such an extensive delegation as in the SRA to a commission or agency, rather than to courts.

Strongly material to the resolution of this issue of first impression is the distinctive nature of the federal law of criminal sentencing. As observed in Part II above, this body of law definitely includes substantive rules of law and not procedural rules only. Nevertheless, the substantive law of criminal sentencing, as it existed before enactment of the SRA, was unique in significant respects. Indeed, among the candidates for recognition as the most distinctive area of federal substantive law, patent, bankruptcy, and immigration law would rank high, but federal sentencing law as it existed before enactment of the SRA was still more distinctive and in a way especially relevant to the issue presented by the challenge to constitutionality of the SRA.

The point is illustrated dramatically by the contrasting sources of useful advice available to a trial judge considering a pending sentencing decision. As to matters involving most areas of law, the judge's most useful help in thinking through all relevant considerations comes from briefs and arguments of advocates and consultation with law clerks. In contrast, as to sentencing decisions before the SRA was enacted, briefs and memoranda were seldom filed and law clerks skilled in legal research and analysis would have little to offer in consultation, other than common sense and good judgment. The judge, if seeking experience-based advice beyond that provided by oral submissions of counsel, would turn to probation officers, who as likely as not would have had no formal legal training. In short, the strictly legal aspects of sentencing were quite limited and rarely in dispute. The more powerful influences on sentencing decisions were expressed not in rules of law but in factors weighed in the exercise of discretion. So strong was this tendency that appellate review was rare, both in theory and in practice. The sentencing decision was in most respects an exercise of discretion unconstrained by any duty of reasoned choice and reasoned explanation.

By enactment of the SRA, Congress has initiated a dramatic change in the law of criminal sentencing. Substantive rules and obligations of reasoned choice and reasoned explanation now become central to each sentencing decision. When such a congressional initiative is taken, a new body of substantive law must be developed —just as, for example, a new body of antitrust law had to be developed after enactment of the Sherman Act in 1890. In that instance, Congress left the development of that new body of law to the courts. In this instance, most of the traditional methods of developing the new body of law—including the method of case-by-case development in courts—would plainly be impractical. Congress has chosen instead a method closer to those used in relation to such substantive law areas as price regulation, trade regulation, and environmental protection. The precise method chosen is not exactly like any previously used, but neither, for example, was the method chosen for price regulation when Congress first determined, in the exercise of its constitutionally authorized power, that compelling national interests would be best served by price controls. The fact that this method of filling out the interstices of statutory law is to some degree innovative does not alone establish that it violates principles of separation of powers explicit or implicit in the Constitution.

"The Constitution does not require three airtight departments of government." *Geraghty*, 719 F.2d at 1210 (citing *Nixon v. Administrator of General Services*, 433 U.S. at 443, 97 S.Ct. at 2790).

The separation of powers inquiry is not so much a review of theoretical abstractions of "who ought to do what" as it is a pragmatic analysis of the extent to which an act by one branch of government prevents another from performing its as-

signed duties and disrupts the balance among the coordinate departments of government. *Nixon,* 433 U.S. at 443, 97 S.Ct. at 2790.

*Geraghty,* 719 F.2d at 1211.

■ When judged by fidelity to the objectives of separation-of-powers doctrine—preservation of the independence of each branch of government and protection against aggrandizement in any branch that would disturb the balance among them—the Sentencing Reform Act survives the defense challenge on the ground of excessiveness of delegation.

### V. *Joint Legislative, Executive, and Judicial Participation in Developing Sentencing Guidelines*

The caution against formalism encourages closer scrutiny also of what I believe to be an implicit premise of some of the separation-of-powers arguments advanced as a challenge to the constitutionality of the SRA. To expose this issue, let us accept the point that it would be unfair to characterize the defense contentions as asserting that governmental powers are distributed among three airtight compartments, with lawmaking power allocated only to the legislative branch. Rather, let us understand the argument to be twofold. First is the argument that the degree of lawmaking power left to the Sentencing Commission by the SRA is excessive. That is the point addressed immediately above. Second, and remaining to be examined further, is the argument that the particular method of exercise of that power by the Sentencing Commission under the SRA is forbidden because it involves the cooperation of participants from all three branches of the government in the work of the development of sentencing guidelines pursuant to the SRA.

It is true that sentencing guidelines that serve as substantive law constraints upon the discretion of judges in making sentencing decisions in particular cases, developed under the SRA, are the product of lawmaking activity in all three branches. As shown in Part III above, it was not novel for Congress to take an initiative that was in itself incomplete and required further lawmaking in other branches of the government. It cannot be plausibly denied, however, that the particular method that the SRA provides for implementation of the congressional initiative differs in one significant way from traditional methods. The work of the Commission involves—and in a way that is unprecedented—cooperation, consultation, and joint action by persons currently holding positions in the executive and judicial branches. Is this kind of cooperative, joint action forbidden by separation-of-powers principles? Is joint action of this kind to be distinguished from the participation of all three branches in successive steps proceeding from congressional initiative, through issuance of administrative regulations with substantive impact, to judicial decisionmaking with precedential effect?

Joint action such as the SRA mandates would be forbidden if one took as a premise that government in our separation-of-powers system is a process in which all interbranch joint decisionmaking is forbidden and the participation of separate branches must always occur in separate steps. Joint action would be forbidden, also, if one took as a premise a fixed-sum view of governmental powers under which the sum of governmental powers to achieve a governmental objective is neither increased nor decreased by the way those powers are allocated and exercised. Under each of these premises, powers would merely be redistributed by cooperative action, one branch giving up to another some of its legitimate powers in order to reach an accommodation that produces a joint decision —such as a lawmaking decision on sentencing guidelines.

■ Each of these premises, however, is basically at odds with the established principle that "[t]he Constitution does not require three airtight departments of government." *Geraghty,* 719 F.2d at 1210 (citing *Nixon v. Administrator of General Services,* 433 U.S. at 443, 97 S.Ct. at 2790). If all three branches are to participate in the task of developing substantive law, then sealing off each branch's participation from

that of the other two, and requiring the three to act one at a time, in a succession of moves and countermoves to preserve a balance of powers, is more likely to impede than to advance the objective. Separation-of-powers doctrine places constraints upon cooperative efforts and joint decisionmaking, but it does not forbid them. Cooperative efforts shall not produce impediments to any branch's exercise of its powers and shall not produce aggrandizement that disturbs constitutional checks and balance. But no part of the text of the Constitution, and no principle implicit in it, forbids cooperative activity in which each branch preserves the integrity of its powers and representatives of two or all three branches, acting together, expedite lawmaking and enhance its quality.

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (quoted with approval in *Morrison,* 108 S.Ct. 2597 at 2620).

In short, the exercise of governmental powers is not a rigid process in which any agreement or accommodation necessarily represents some surrender of legitimate power by at least one branch. Cooperation, if conducted in a way that does not offend the underlying principles and objectives of separation of powers, is constitutionally permissible.

The Court in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), made the point that " 'the judicial power of the United States' vested in the federal courts by Article III, § 1 of the Constitution ... [cannot] be *shared* with the Executive branch," *id.* at 704, 94 S.Ct. at 3106 (emphasis added), the Chief Executive cannot *"share* with the Judiciary the veto power," *id.* (emphasis added), and Congress cannot *"share* with the Judiciary the power to override a Presidential veto,"

*id.* (emphasis added). Nevertheless, the Court, focusing on substantive concerns rather than mere form, held in *Nixon* that the prohibition of sharing of power implicit in separation-of-powers doctrine does not insulate the exercise of the power of each branch in a way that would sustain a claim of absolute Presidential privilege of immunity from judicial process in all circumstances. "[T]he separate powers were not intended to operate with absolute independence." *Id.* at 707, 94 S.Ct. at 3107. The Court rejected the broad claim of privilege because the recognition of such a privilege "would upset the constitutional balance of a 'workable government' and gravely impair the role of the courts under Art. III." *Id.*

■ Under the SRA, judges who participate in the work of the Sentencing Commission are not engaged in a constitutionally-forbidden "sharing" of judicial power with officials of the executive branch, nor are the latter "sharing" executive power with judge-members of the Commission. Each member, though participating in the work of the Commission, remains free to exercise that member's executive or judicial function without impairment. Of course, the lawmaking of the Commission under "legislatively delegated authority" thereafter affects individual case decisions in the judicial branch as well as further action implementing the SRA in the executive branch. It does so, however, only in the sense that law constrains the exercise of all powers in all three branches. Thus, the judiciary's later acceptance of the Commission's guidelines as law that controls individual case decisions is no more a demonstration of a forbidden "sharing" of power than is the judiciary's acceptance of statutes and administrative regulations as law that controls later judicial decisions (so long as the statutes do not offend constitutional mandates and the regulations do not offend either constitutional or statutory mandates).

■ Focusing upon particular characteristics of the Sentencing Commission, defendant argues that judge-commissioners will find it impossible to maintain their

independence and impartiality in the courtroom when they are appointed and removed by the President and serve on the Commission with two non-voting members of the executive branch, including the Attorney General. Although the particular composition Congress chose for the Commission is not a "traditional" one, defendant has pointed to nothing in the Constitution that explicitly or implicitly bars such a composition. Nor has any convincing argument been made that the joint service of executive and judicial officers on this Commission will impair the functioning of either branch.

Congress had a rational basis for determining that the experience and insight of judges, developed from their judicial experience, would be useful in the work of the Commission. Because judge-members bring to this work a perspective characteristic of the judicial branch, it may even be said that their functioning on the Commission may appropriately be characterized as "judicial" in a broad sense. But, the judge-commissioners are not acting in an adjudicatory capacity when performing their Commission duties. Constraints applicable to influences upon performance of an adjudicatory function are therefore not apt.

Nor has any reasoned basis been advanced for determining that service on the Commission would disqualify judge-members from future judicial service generally. As Judge Mazzone has stated, "although the participation of judges on *some* types of extra-judicial agencies may possess some ability to affect the impartiality of particular judges, service on the Commission does not carry that risk." *Alves,* 688 F.Supp. at 77.

I concur also in Judge Mazzone's conclusion that recusals incident to service on the Commission do not impermissibly impair judicial performance. *Id.*

## VI. *Placement of the Sentencing Commission and Presidential Control*

■ Perhaps more than any of the other arguments of either party in this matter, the defense contention regarding placement of the Commission in the judicial branch depends on accepting the view that form is critically important to the matter at issue. The Sentencing Commission has responded that placing the Commission in the judicial branch may be seen in part as merely a "housing," "housekeeping," "budgetary," or "administrative" choice. Whether or not any of these particular characterizations should be accepted, the underlying point that this choice does not affect the substantive rights of the defendant is valid unless placement of the Commission in the judicial branch has substantive implications in relation to one of the other constitutional challenges.

I conclude that no such substantive implication has been identified. Defendant shows no injury to himself when he claims only that the sentencing guidelines as a whole are unconstitutional and fails to show some way in which placement of the Commission in the judicial branch causes injury to him that would not have occurred had the Commission been designated either as an agency of the executive branch or as an independent agency.

With one exception, no reasoned basis has been advanced for determining that substantive implications are involved in the formal placement of the Sentencing Commission in the judicial branch. The exception is the argument that the Commission must be placed in one or another of the branches of government recognized in the Constitution and wherever it is placed it will have members from at least one other branch serving outside their branch. This is, in substance, a formal argument that the separation-of-powers doctrine not only forbids aggrandizement that threatens the balance of powers fashioned in the Constitution but also forbids joint decisionmaking by officials of different branches, even when they respectively surrender no power.

One of the decisions sustaining defense challenges to the SRA has reasoned:

In *Bowsher* [*v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986),] an officer of the legislative branch was not allowed to serve in the executive branch; nor should a member of the judiciary serve in that capacity.

*United States v. Molander,* 683 F.Supp. 701, 707 (W.D.Wis.1988). In *Bowsher,* however, the Court reasoned that Congress had reserved "for itself the power of removal of an officer charged with the execution of the laws" by means other than impeachment and that "[t]o permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws." 478 U.S. at 726, 106 S.Ct. at 3188. No comparable threat to the constitutional balance of powers appears here. Neither executive nor judicial power is threatened by the participation of members of both these branches in the Commission's work. Also, the Presidential power to remove individual members of the judiciary from membership on the Commission does not affect a person's continued service as a member of the judicial branch, even when no longer a member of the Commission. Although perhaps unprecedented, the composition of membership of the Commission does not appear to be a threat to the constitutional balance of powers. I conclude that the constitutional challenges to the membership of the Commission and to its placement in the judicial branch cannot be sustained.

I concur in Judge Mazzone's determination that the limited degree of Presidential control over the Commission and its membership does not amount to a violation of constitutional principles of separation of powers. *Id.* 688 F.Supp. at 77.

In summary, I conclude that the defense challenges to the guidelines on separation-of-powers grounds lack merit.

### VII. *Due Process*

In summarizing his due process contentions, defendant argues that "the work of the Commission ... essentially dictates the sentences to be imposed on the vast majority of federal criminal defendants." Defense Memorandum (Docket No. 13), page 5. The reality, however, is that the work of the Commission "dictates" only in the sense that law always dictates results in judicial decisionmaking. That consequence is, of course, the essence of a "government of laws," *cf.* Mass. Const. Pt.

I, Art. XXX, in contrast with totally discretionary decisionmaking by each individual adjudicator. It plainly is true that in enacting the SRA Congress, with an explicit purpose of reducing sentencing disparity, has chosen to cause criminal sentencing decisions to be guided by law to much greater extent than in previous practice, and to correspondingly less extent to be determined by the exercise of discretion. That is a choice Congress was constitutionally free to make. That choice is not offensive to due process standards.

For the foregoing reasons, defendant's several challenges to the constitutionality of the sentencing guidelines are denied.