**UNITED STATES of America**

v.

**Leonard SUMPTER, Defendant.**

**No. 88 Cr. 275 (KC).**

United States District Court,
S.D. New York.

July 5, 1988.

Deborah Landis, Asst. U.S. Atty., S.D. N.Y., New York City, for plaintiff.

John Kaley, Levine, Weinberg, Kaley & Pergament, Garden City, N.Y., for defendant.

## OPINION AND ORDER

CONBOY, District Judge.

The Defendant has challenged the constitutionality of the United States Sentencing Commission and the enforceability of the Guidelines promulgated by the Commission. Since the effective date of the Guidelines on November 1, 1987, the question now before us has been one of unprecedented engagement for federal courts throughout the nation. More than one hundred fifty judges have ruled on the matter, and the Supreme Court has agreed to hear expedited, direct argument of the issue during its next term. *See, United States v. Johnson,* 682 F.Supp. 1033 (W.D. Mo.1988), *cert. granted sub nom. United States v. Mistretta,* —— U.S. ——, 108 S.Ct. 2818, 100 L.Ed.2d 920. It has recognized the necessity for prompt resolution of the

question, given the tremendous impact of the law and guidelines upon the criminal docket of the federal judicial system, and the unprecedented and sweeping reform they work upon the sentencing power of federal judges. Indeed, this reformulation of judicial power is directed at the very heart of the judge's public authority and duty: to imprison or not imprison those convicted of crime, and to prescribe the duration of the deprivation of liberty of those sent to prison.

That the field upon which this constitutional question is being contested is confused with volleys and charges from every direction, there can be no doubt. One need only review the partial account of the numerous doctrinal and theoretical grounds upon which the various district courts have heretofore decided this matter, described in the excellent opinion of my colleague, Honorable Peter K. Leisure, in *United States v. Olivencia,* 689 F.Supp. 1319 (S.D.N.Y. 1988), to appreciate the range of constitutional subtlety at work here.

A). *Federal Sentencing Policy and the Reform of 1984*

For an illuminating review of the history and background of the Sentencing Reform Act of 1984 (the "Act"), passed as Chapter II of the Comprehensive Crime Control Act of 1984, § 217, Pub.L. No. 98–473, 98 Stat. 1837, 2017, the reader is directed to the excellent opinion of my colleague, Honorable Michael B. Mukasey, in *United States v. Mendez,* 691 F.Supp. 656 (S.D.N.Y.1988).

■ To summarize the evolution of the definition and application of the criminal sentencing power, it need, for our purposes here, only be noted that since the earliest days of the Republic, it has been well settled that the ultimate authority to ordain punishment for transgression of the federal criminal law is established in the Congress. *See United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). The imposition of criminal punishment following conviction, and the exercise of any discretion, delegated from Congress, in connection therewith, is a judicial function. *Ex parte United States,* 242 U.S. 27, 41, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916). In the half century between 1910, when the Congress established the United States Parole Board in the executive branch to introduce ad hoc flexibility in sentencing through creation of an executive prisoner release discretion, and 1958, when Congress began, with the creation of judicial sentencing institutes, to express incipient and then growing dissatisfaction with the disparities in federal sentencing practice, the broad national policy was toward a system of indeterminate sentencing in the federal courts carried out collegially by the legislative, executive and judicial branches of the Government.

The first significant constraint on the theory, policy, and practice of truly unfettered indeterminate sentencing came when the Parole Board in 1973 imposed upon itself a set of detailed parole guidelines that established a "customary range" of confinement for various classes of offenders. Congress endorsed this and other reforms relating to back-door sentencing policy in the Parole Commission and Reorganization Act of 1976, 18 U.S.C. §§ 4201–4218. See, *United States Parole Comm'n. v. Geraghty,* 445 U.S. 388, 391, 100 S.Ct. 1202, 1206, 63 L.Ed.2d 479 (1980). This then was the essential shape of the sentencing power in the federal courts on the eve of the national debate that lead to the passage of the Sentencing Reform Act in the Comprehensive Crime Control Act of 1984, *supra.*

What conditions and concerns impelled the Congress to enact the Sentencing Reform Act? To state the obvious to anyone who lived in the United States during the period 1978—1984, this was a time of unprecedented Congressional concern about and absorption in the problem of crime and violence in America, with particular emphasis upon the role of international drug traffic, and the pervasive national misery brought about by so much crime. No one could seriously question that the quality of life in America, especially in its cities, was profoundly degraded during those years by

preoccupation with security, fear of the violent felon, and the menace of an ever expanding volume of dangerous drugs into the school, the workplace, and the home.

Confronted with such conditions, the Congress concluded that "every day Federal judges mete out an unjustifiably wide range of sentences to offenders with similar histories, convicted of similar crimes, committed under similar circumstances," which it regarded as "unfair both to the offenders and to the public." S.Rep. No. 225, 98th Cong., 1st Sess. 38, 45 (1983) (hereinafter "S.Rep."), reprinted in 1984 U.S.Code Cong. and Admin.News 3182, 3221, 3228. This resulted in a system that "lack[ed] the sureness that criminal justice must provide if it is to retain the confidence of American society and if it is to be an effective deterrent against crime." *Id.* 242 U.S. at 49–50, 37 S.Ct. at 77–78.

In passing the Act, Congress eliminated standardless discretionary sentencing and provided explicit guidance on sentencing policy; it placed complete sentencing discretion, constrained by statute and guidelines, in judges and eliminated the parole function; it delegated the task of developing, promulgating and revising binding, judicial guidelines to a newly created Commission structured to reflect the collegial roles of the three branches as heretofore described; and it provided for appellate review of sentences in individual cases.

Federal sentencing policy was established by the Congress through the Act to be determinate in character, S.Rep. at 115, 1984 U.S.Code Cong. & Admin.News at 3235; within categories of offenses and offenders, the range of imprisonment must generally not vary between maximum and minimum by more than 25%, Id. at 52, 37 S.Ct. at 78–79; and the maximum terms of imprisonment shall continue to be set by Congress, 18 U.S.C. § 3559(b)(2). Furthermore, the Commission is told quite explicitly the philosophical and policy parameters within which it is to carry out its mandate. The purposes of sentencing under the Act *shall* be to reflect the seriousness of the offense, to promote respect for law, to afford adequate deterrence to criminal con-duct, to protect the public from further crimes of the defendant, and to provide the defendant with correctional treatment. 18 U.S.C. § 3553(a)(2). The Congress additionally instructed the Commission about defining the kind and extent of punishment, establishing sentence ranges, categorizing offenses under seven enumerated factors, categorizing offenders under eleven enumerated factors, and assessing the weight to be given particular facts and circumstances. 28 U.S.C. § 994(a) through (m).

The Sentencing Commission is "an independent commission in the judicial branch of the United States." 28 U.S.C. § 991(a). The seven members, at least three of whom must be federal judges, are appointed by the President upon the advice and consent of the Senate, and are "subject to removal from the Commission by the President only for neglect of duty or malfeasance in office or for other good cause shown." *Id.*

In summary, then, the Act *mandates* the participation of Article III judges in the ongoing formulation of a national federal criminal sentencing policy, *in conjunction with* the Congress and the President, in a field of broad social and political significance and sensitivity, in the context of a national upheaval over crime control policy in general and criminal sanctions in particular, and under the explicit injunction to reestablish the confidence of American society in the criminal justice system. S.Rep. at 49–50, 1984 U.S. Code Cong. & Admin. News at 3232–3233. In this novel and highly controversial role, involving as it does no mere ministerial or parochial act such as certifying a claim or appointing a clerk, the judges on the Commission are subject to removal from it by the President for "neglect of duty."

The Justice Department, the Sentencing Commission and Defendant offer a welter of constitutional argument supporting and attacking the Act. None, however, seriously disputes that, when taken in conjunction with the Bail Reform Act of 1984, the Act worked a profound, indeed a seismic, change in federal criminal jurisprudence. The policy role devised for and conferred

upon Article III judges by the Act is unprecedented in significance in this century.

### B). *Does the Act as a Whole Offend the Separation of Powers Doctrine?*

█ The ultimate answer to this question turns upon whether the Necessary and Proper Clause of the Constitution authorizes Congress to create the Commission for the purposes set forth in the Act, and whether the Congress set forth sufficiently explicit policy parameters in the Commission's mandate to facilitate translation of Congress's own legislative determination into guidelines, as opposed to abdicating its legislative duty to the Commission in too general and yielding an authority. The Commission is, by statute, a judicial entity, although the Justice Department insists that it must be constructively placed in the executive branch.

As a general proposition, it is clear that it was "the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." *Buckley v. Valeo*, 424 U.S. 1, 120, 96 S.Ct. 612, 682–83, 46 L.Ed.2d 659 (1976). On the other hand, as Justice Holmes observed in *Springer v. Philippine Islands*, 277 U.S. 189, 209–11, 48 S.Ct. 480, 484–86, 72 L.Ed. 845 (1928) (Holmes, J., dissenting), "[t]he great ordinances of the Constitution do not establish and divide fields of black and white. Even the more specific of them are found to terminate in a penumbra shading gradually from one extreme to the other ... however we may disguise it by veiling words we cannot ... divide the branches into watertight compartments." As Justice Jackson eloquently put it, the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 638, 72 S.Ct. 863, 871–72, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

Whatever the nuances in the long line of cases addressing the doctrine, there can be little doubt that the Supreme Court's recent separation of powers jurisprudence puts great emphasis upon an aggrandizing motive and consequence vis a vis the other branches in determining whether a violation of the doctrine has occurred. The principal question asked by the Court in these cases was whether Congress aggrandized its own role in a function not constitutionally entrusted to it. *See, e.g., Morrison v. Olson*, —— U.S. ——, ——, 108 S.Ct. 2597, ——, 101 L.Ed.2d 569 (1988) (placement of the appointment power of an Independent Counsel in the Judicial Branch to investigate and prosecute crime, without summary removal power in the President); *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986) (retention of removal power over the Comptroller General whose functions entailed executive responsibilities); *INS v. Chadha*, 462 U.S. 919, 957–958, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (use of the legislative veto without passing new legislation subject to the President's veto); *Buckley, supra*, at 113, 96 S.Ct. at 679–80 (appointment of a majority of the voting members of the Federal Election Commission). In *Buckley, Chadha* and *Bowsher*, the Court found the delicate balance of powers threatened by a practical, and not merely theoretical, initiative by the Congress likely to enhance its own authority and diminish that of a coequal branch, in all of these cases, the executive. In *Morrison*, however, the Court found that "this case does not pose a dange[r] of congressional usurpation of Executive Branch functions ... similarly we do not think that the Act works any judicial usurpation of properly executive functions ... Finally we do not think that the Act 'impermissibly undermine[s] the powers of the executive branch'... 'or disrupts the proper balance between the coordinate branches by prevent[ing] the Executive Branch from performing its constitutionally assigned functions.'" *Id.* —— U.S. at ——, 108 S.Ct. at ——.

Applying these recent cases to the Act at hand, it is clear that on general grounds the Act as a whole does not offend the separation of powers doctrine. There is here simply no aggrandizing expansionism by the Congress at the expense of the executive or judicial branches. Both the President and the Courts are given roles in

the development of national sentencing policy which the Congress is authorized by the Constitution to exclusively control. In deference to the long history and tradition of a three branch collegiality on sentencing, the Congress chose to continue it, and indeed emphasized its special concern "and strong feeling that, even under this legislation, sentencing should remain primarily a judicial function." S.Rep. at 159, 1984 U.S. Code Cong. & Admin.News at 3342. Furthermore, it is clear that, by putting the Commission in the Judicial Branch and staffing it, at least in part with Article III judges, the Congress has sought to give the Courts the decisive role in the formulation, monitoring and revision of the Guidelines. Moreover, it has retained no power over the Commission or its members. The case is analogous to *CFTC v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), handed down the same day as *Bowsher*, involving Congressional authorization to the CFTC to adjudicate common law counterclaims, in claimed derogation of the constitutional powers of Article III Courts. The Court answered its question, "whether Congress impermissibly undermined, without appreciable expansion of its own power, the role of the Judicial Branch", 106 S.Ct. at 3261, in the negative, declining to adopt formalistic and unbending rules that might "unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers," *id.* at 3258.

The Necessary and Proper Clause of Article I of the Constitution explicitly empowers Congress to enact legislation to effectuate not only its own enumerated powers, but all the powers of all branches of the Government, including powers that Congress has validly delegated. *See Kaiser Aetna v. United States*, 444 U.S. 164, 172, 100 S.Ct. 383, 388–89, 62 L.Ed.2d 332 (1979). Interestingly, as the Commission points out in its Brief, p. 28, although the administration of parole is the responsibility of the executive branch and the administration of probation is the responsibility of the judicial branch, both are functionally forms of supervised release that serve as alternatives to incarceration. This alloca-

tion of responsibility by the Congress, so inherently related to the sentencing power, is surely not constitutionally compelled. Where Congress seeks assistance from another Branch, "the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination." *Hampton and Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928). The mandate given to the Commission, as set forth above, is sufficiently precise and explicit to leave no doubt that Congress established here adequate legislative parameters within which the Commission is to exercise extraordinary but subordinate substantive rule making powers. Accordingly, the Act as a whole does not offend the Separation of Powers Doctrine of our Constitutional jurisprudence.

C). *Does the Delegation of Rule–Making Authority to a Commission in the Judicial Branch Undermine the Impartiality and Independence of the Judiciary or Impede the Congress or the President from Carrying Out Constitutionally Assigned Functions?*

Before dealing with this question, I note that the Department of Justice insists that the Commission be treated as an entity in the executive branch.

In brief, the argument of the Department asserts that even though Congress explicitly placed the Commission within the judicial branch, it should be constructively found to be in the executive branch, because its functions are executive in character, translating sentencing policy already established by Congress, into mere rules of guidance for judges. Furthermore, several of its members, who must, under statute, be judges, are said by the Justice Department to be not sitting as judges *per se*, in that they perform executive and not judicial functions, and that therefore the President's removal power over them, as granted by the statute, does not offend Article III of the Constitution. I note, however, that there is nothing in the statute that suggests that the Commission's judicial

members are to sit as individuals and not as judges. In fashioning the Department's argument, necessity, no doubt, has become the mother of invention.

■ The plain difficulty with this broad argument of locating the Commission in the executive branch is that this Court has no authority, except under very limited circumstances, to rewrite the statute and thereby frustrate the clear intention of Congress to constitute the Commission as a judicial entity in the judicial branch, with judges sitting as judges and representing their hundreds of judicial colleagues because Congress wanted the federal judiciary to play a decisive role in the guideline process.

The Justice Department urges that the matter is merely one of incorrect labeling, with no operative consequences, and that accordingly, this Court may reclassify, in spite of Congressional intent, the Commission from judicial to executive status. The Department cites the analysis of the Supreme Court in *Bowsher*, for this proposition, but overlooks the "operative consequences" of such a revision.

The Justice Department clings to the characterization of the duties imposed by the Act as executive functions and the Commission's judges as executive functionaires, because the Supreme Court has broadly stated that "executive or administrative duties of a non-judicial nature may not be imposed on judges holding office under Article III of the Constitution." *Buckley, supra,* 424 U.S. at 123, 96 S.Ct. at 684.

The plain and compelling answer to this argument is that the duties imposed upon the Commission are not executive in character at all, but quasi-legislative and quasi-judicial. Rule-making in aid of the judicial function is conceded by the Justice Department to be inherent in the Article III power (Brief, 19, 40), and the Supreme Court has held that the Courts may receive authority from Congress to prescribe such rules, as under, for example, the Rules Enabling Act. *See Palermo v. United States,* 360 U.S. 343, 353 n. 11, 79 S.Ct. 1217, 1225 n. 11, 3 L.Ed.2d 1287 (1959).

The parties do not appear to question, in general, Congressional power to create necessary and proper supportive and auxiliary agencies and institutions in the judicial branch to aid in the carrying out of judicial functions. The Act has created a Commission to aid in the conditional exercise of a *pure,* albeit discretionary, judicial power: the imposition of sentences in criminal cases. The only relevant constitutional question is whether such an arrangement constitutes a genuine threat to the ability of any branch to carry out its constitutionally assigned functions. From earliest times, Article III Courts have been authorized to promulgate rules and procedures affecting their operations and procedures. *Wayman v. Southard,* 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1845). As long as judicial rule making aids in "enforcing rights and duties recognized by substantive law and for justly administering remedy and redress," such judicial duties are constitutionally assigned. *Sibbach v. Wilson & Co.,* 312 U.S. 1, 9–10, 61 S.Ct. 422, 424–25, 85 L.Ed. 479 (1941). The key element here lies in the injunction that the rules be in aid of substantive law and not in the creation of substantive rights. An allied concept is the constitutional requirement that their be no "incongruity in the duty required." *Ex parte Siebold,* 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1880). In its recent decision upholding the Constitutionality of the Independent Counsel legislation, the Supreme Court again had recourse to the concept of the imposition of incongruous duties in the context of inter-branch relations. *Morrison v. Olson, supra,* —— U.S. at ——, 108 S.Ct. at ——.

■ The Guidelines, in design and impact, do not create substantive rights, and do not bind the public at large, or even the class of convicted federal defendants at large, but they implement national policy set down by Congress, and they regulate federal judges, partially through federal judges, in the exercise of discretion, as that judicial function reaches, shapes and defines remedy in the aftermath of a criminal conviction. There is no incongruity in such duties being imposed upon either the Com-

mission established in the Judicial Branch, or Article III judges sitting on such a Commission. Accordingly, the Act does not impede any branch in the carrying out its constitutionally assigned functions.

D). *Does the Removal Power of the President over the Judges on the Commission Violate the Separation of Powers?*

 The Act constitutionally imposes upon Article III judges, as judges, quasi-judicial duties in aid of the judicial function. These duties do not expand or alter the judicial power under Article III, since they are not directly adjudicatory or jurisdictional, and hence do not violate Article III, which expressly limits the judicial power to the resolution of "cases" and "controversies." *Muskrat v. United States*, 219 U.S. 346, 356, 31 S.Ct. 250, 253–54, 55 L.Ed. 246 (1911). Nonetheless, these new quasi-judicial duties are unprecedented in significance, and represent a novel initiative in inter-branch collegiality. The Commission, and the judges on it are, after all, engaged in the daunting work of reestablishing, in the words of the Congress, the confidence of American society in the criminal justice system. S.Rep. at 49–50, 1984 U.S.Code Cong. & Admin.News at 3232–3233. Indeed, the entire federal judiciary is, we are told by the staff of the Commission, embarked upon the creation of a national federal common law of sentencing through the mediating control of the Guidelines, as monitored and refined by the Commission.[1] Finally, as I have already observed, the sentencing function, and *all that is properly ancillary to it*, goes to the heart of the responsibility and authority of being a judge in a constitutional and democratic order. The removal power, albeit limited, lodged in the President by the Act over the Commission's Article III judges doing this highly important quasi-judicial work, accordingly raises a profound constitutional question.

The Commission argues, inexplicably, that the statute's grant of removal power to the President does not give him actual control over the Commission, and, of course, the Article III judges who serve on it. The Supreme Court's extended analysis of Congress's removal power over the Comptroller General, and its relation to the separation of powers doctrine in *Bowsher*, is applicable to the matter before us. The Commission's position, in light of *Bowsher*, is untenable.

The creation and promulgation of the guidelines are not mere administrative or ministerial acts, reaching as they do, in so decisive and unprecedented a manner, the central and gravest power of every federal judge in every criminal case on the federal docket. Not the result of mere rule making, they are essentially quasi-judicial functions in aid of Article III powers, and to borrow a phrase of the Supreme Court in *Miller v. Florida*, —— U.S. ——, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), dealing with similar guidelines promulgated by a state, they "directly and adversely effect" this defendant, and every defendant in the nation convicted of criminal conduct in the courts of the United States. Since these are quasi-judicial duties, they cannot be placed under the threatening cloud of an Executive removal power, especially one that authorizes removal for behavior as vague as "neglect of duty." A hearing under such a removal power would without doubt prevent the subject judge from accomplishing his "constitutionally assigned functions."

In *Morrison v. Olson, supra*, the Supreme Court noted in regard to a law depriving the President of summary dismissal power over the Independent Counsel, that when the Congress gave the Courts certain judicially related functions in the selection and monitoring of the Independent Counsel, "we cannot say that the imposition of a 'good cause' standard for removal [of the Independent Counsel] by itself unduly

---

1. *See, Departure Sentences Under the United States Sentencing Commission Guidelines: Interim Report of the Ad Hoc Sentencing Study Group*, Professor Daniel J. Freed, Yale Law School, December 3, 1987; and *Remarks*, Gary Peters, Acting Special Counsel, U.S. Sentencing Commission, both presented to the assembled Judges of this District, Arden House, Harriman, New York, February 5, 1988.

trammels on executive authority." *Id.* —— U.S. at ——, 108 S.Ct. at ——. This is indeed, then, a powerful device to leverage influence upon an officer subjected to it. The suggestion that a federal judge, while sitting as a Commissioner in the judicial branch and subject to charges under such authority, could carry out his or her Article III duties, is wholly untenable. The ultimate and decisive question in such matters going to the separation of powers doctrine, the Court concluded in *Morrison,* is whether a removal power impedes the ability of a constitutional officer to perform his or her constitutional duty. *Id.* —— U.S. at ——, 108 S.Ct. at ——. In that case, the President's constitutional authority was found not to be impermissibly injured by a limiting removal power. Here, the constitutional authority of federal judges is impermissibly injured by an expanding removal power.

Think of it: a United States Judge under attack by the President for neglect of duty. Who can doubt that this would be a riveting and damaging contest played out in the full and unforgiving presence of the nation's newspapers, radio microphones, and television cameras. During what would undoubtedly be protracted and notorious inter-branch strife, how could such a judge, so accused, maintain the confidence of the parties on his criminal and civil dockets in the dignity and stature of his court? The plain answer is that he could not. He would then be, in the words of Alexander Pope, "sole judge of truth, in endless error hurled." [2]

Accordingly, the President's removal power over the Commission's judges renders it, and the Guidelines it has promulgated, unconstitutional. The defendant Sumpter shall be sentenced, in all respects, in accordance with the sentencing law applicable to the relevant criminal conduct prior to November 1, 1987.

SO ORDERED.

---

**2.** Alexander Pope *An Essay on Man,* II, 13; *Poems,* Endicott and Rhodes, London, 1837.