UNITED STATES of America,

v.

Beverly BOGLE,

UNITED STATES of America,

v.

Marianne EUTSEY,

UNITED STATES of America,

v.

Rafael S. PENA,

UNITED STATES of America,

v.

Alan P. FOGEL,

UNITED STATES of America,

v.

Marie D. PAUL,

UNITED STATES of America,

v.

Steven M. ROBERTS, et al.,

UNITED STATES of America,

v.

Yolanda Rogers PEOPLES,

UNITED STATES of America,

v.

Augusto GOMEZ.

Nos. 87–856–CR–MARCUS, 87–858–CR–KEHOE, 88–14001–CR–DAVIS, 88–8019–CR–DAVIS, 87–855–CR–ARONO-VITZ, 88–006–CR–RYSKAMP, 87–848–CR–KEHOE and 87–964–CR–HASTINGS.

United States District Court, S.D. Florida.

Aug. 11, 1988.

Dexter W. Lehtinen, U.S. Atty., and Harriett Galvin, Asst. U.S. Atty., S.D. Fla., Miami, Fla., for U.S.

Benson B. Weintraub, Natl. Ass'n of Criminal Defense Lawyers, Sonnet, Sale & Kuehne, Miami, Fla.

Stewart Abrams, Asst. Federal Public Defender, Miami, Fla., for defendant Beverly Bogle.

Ken Swartz, Asst. Federal Public Defender, Miami, Fla., for defendant Marianne Eutsey.

Philip Brutus, Asst. Federal Public Defender, Miami, Fla., for defendant Marie D. Paul.

Stephen Bronis, Miami, Fla., for defendant Rafael Peña.

Michael Salnick, West Palm Beach, Fla., for defendant Alan P. Fogel.

Luis Rojas, Hialeah, Fla., for defendant Steven Roberts.

Edward McHale, Miami, Fla., for defendant Yolanda Peoples.

Melvyn Kessler, Miami, Fla., for defendant Augusto Gomez.

Before KING, Chief Judge, ROETTGER, ARONOVITZ, HOEVELER, GONZALEZ, PAINE, KEHOE, SPELLMAN, DAVIS, HASTINGS, NESBITT, MARCUS, SCOTT, ZLOCH and RYSKAMP, District Judges, and ATKINS, Senior District Judge.

MARCUS, District Judge.

On June 15, 1988, this Court, sitting *en banc*, issued an Order finding the Sentencing Guidelines ("Guidelines") promulgated by the United States Sentencing Commission ("Commission") pursuant to the Sentencing Reform Act of 1984 as amended ("Act"), Pub.L. No. 98–473, ch. II,/98 Stat. 1837, 1976, 2017 (1984) *amended by* Sentencing Act of 1987, Pub.L. No. 100–182, 101 Stat. 1266 (1987), unconstitutional as a violation of the doctrine of separation of powers. This decision was reached reluctantly and after lengthy deliberation and analysis based upon consideration of the briefs filed by the Parties and *amici curiae* as well as oral argument taken before the full Court. At that time, we recognized that being "called upon to decide the validity of an Act of Congress [is] one of the 'gravest and most delicate' tasks that a Court will ever face." *United States v. Bogle*, 689 F.Supp. 1121, at 1123 (S.D.Fla. 1988) (*en banc*) (*quoting Rostker v. Goldberg*, 453 U.S. 57, 65, 101 S.Ct. 2646, 2656, 69 L.Ed.2d 478 (1981)). We further recognized that although the Commission undertook its mission with great wisdom and skill, the placement of the Commission in the judicial branch and the required participation of at least three federal judges collided fundamentally with the doctrine of separation of powers because it called upon judges to write the very laws they would be required to interpret and apply. Ac-

cordingly, we ruled that the Guidelines would not be applied in the Southern District of Florida until we received further guidance from the Eleventh Circuit Court of Appeals or the Supreme Court.

In our initial *en banc* Order, we declined to reach the question of severability, and ordered further briefing on that issue. Subsequently, the United States moved to stay the effect of our ruling pending the decision of the United States Supreme Court in *United States v. Mistretta* and *Mistretta v. United States*, Nos. 87–1904, 87–7028, *cert. granted*, — U.S. —, 108 S.Ct. 2818, 100 L.Ed.2d 920 (1988). Because of the need to resolve the stay and severability issues on an expedited basis, and the critical need to establish uniform procedures within the district while awaiting guidance from the United States Court of Appeals for the Eleventh Circuit, or the Supreme Court, in a brief *per curiam* Order we denied the Government's application for a stay and found the provisions of the Act which eliminated parole not severable, and the provision concerning "good time" credits severable. In that Order of June 30, 1988, we indicated that an opinion would later issue that detailed our reasons for these rulings. We do so today.

## I. STAY

The standard that must be met in order to gain a stay pending Supreme Court review is well established. First, there must exist a " 'reasonable probability' that four Justices will consider the issue sufficiently meritorious to grant certiorari or to note probable jurisdiction." *Rostker v. Goldberg*, 448 U.S. 1306, 1308, 101 S.Ct. 1, 2, 65 L.Ed.2d 1098 (1980) (Brennan, Circuit Justice) (citations omitted). Second, there must be a

> fair prospect that a majority of the Supreme Court will conclude that the decision below was erroneous.... Third, there must be a demonstration that irreparable harm is likely to result from the denial of a stay. And, fourth, in a close case it may be appropriate to "balance the equities"—to explore the relative harms to applicant and respondent, as

well as the interests of the public at large.

*Id.* (citations omitted). The applicant has met the first requirement since the Supreme Court has granted certiorari in a case that presents issues identical to those under consideration here. Accordingly, we are left to examine the other prerequisites.

■ To begin with, we believe that the United States is without a "fair prospect" of prevailing in the Supreme Court. We reach this judgment principally for the reasons detailed in our opinion of June 15, 1988, and because of the position the Government asserted in the cases before us. We emphasize that the United States conceded that the legislation as enacted by Congress was unconstitutional. In its memorandum of law and at oral argument, the Government agreed with the Defendants that the placement of the Commission in the judicial branch, in fact, violated the separation of powers doctrine. [Memorandum of the United States of America on the Constitutionality of the Work of the Sentencing Commission at 3, 28–38]. The Government's answer to this constitutional defect was to call upon the Court to perform judicial surgery by "peeling away" the explicit Congressional designation placing the Commission in the judiciary and reconstituting the statute so as . to house the Commission in the executive branch. We rejected this position as being inconsistent with both the explicit language of the Act and the obvious intent of the legislature. Moreover, we concluded that even if the Government could surmount those hurdles, placement in the executive branch still would not cure the primary constitutional infirmity of requiring judges to write the law of punishment for all federal crimes. *Bogle, supra,* at 1156–1159. We do not view the prospect as "fair" that the applicant will be able to persuade a majority of the Supreme Court that although—by the Government's very concession—this Act is unconstitutional as framed, radical, reconstructive surgery would be an appropriate means to redress the defect.

The Government correctly states the law when it argues that "[t]he strong presumption of constitutionality that attaches to an act of Congress is a compelling factor in evaluating the probability of success on the merits." [Motion to Stay Ruling Declaring Sentencing Guidelines Unconstitutional Pending a Final Decision of the United States Supreme Court in *United States v. Mistretta,* Nos. 87–1904, 87–7028, at 5 *citing Bowen v. Kendrick,* — U.S. —, 108 S.Ct. 1, 97 L.Ed.2d 787 (1987) (Rehnquist, Circuit Justice); *Walters v. National Association of Radiation Survivors,* 468 U.S. 1323, 1324, 105 S.Ct. 11, 12, 82 L.Ed.2d 908 (1984) (Rehnquist, Circuit Justice) ] [hereinafter "United States' Brief"]. However, the mere recitation of this standard does not persuade us, especially in view of the position advanced by the United States. The presumption of constitutionality afforded an Act of Congress might, in the abstract, weigh in favor of the entry of a stay. However, the Government never asserted before this Court that the statute as written *was* constitutional. Accordingly, the presumption alone does little to convince us that the United States has a fair prospect of success on the merits in the Supreme Court.

Further, we are unconvinced that any developments in the law subsequent to our ruling of June 15, 1988 would compel a different result. While we see no need to revisit the substance of our decision in order to resolve the motions before us, we note that the day before we denied the Government's application for a stay, the Supreme Court decided *Morrison v. Olson,* 481 U.S. 221, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). In its determination that the Ethics in Government Act of 1978, 28 U.S.C.A. §§ 49, 591 *et seq.* (Supp.1988) is constitutional, the Court employed an analysis that was in no way inconsistent with the functional analysis of separation of powers used in *Bogle.* In large measure the Court's analysis in *Morrison* rested on the Special Division's power under the Appointments Clause, U.S. Const.Art. II, § 2, cl. 2, to appoint inferior officers, and the Court concluded that "we do not think it impermissible for Congress to vest the power to appoint independent counsels in a specially created federal court." *Morrison,* 108

S.Ct. at 2610. In *Bogle,* we considered at length the relevance of the appointments clause and in particular the cases of *Ex parte Siebold,* 100 U.S. 371, 25 L.Ed. 717 (1879), and *Hobson v. Hansen,* 265 F.Supp. 902 (D.D.C. 1967) (three-judge court) to the cases *sub judice. See Bogle, supra,* at 1147–1149. We concluded that those cases were different first, because under the Guidelines, the judge/Commissioner did not exercise an appointment power; and second that the power actually conferred upon judge/Commissioners under the Act was "wholly unlike the delegation of a unique and discrete appointment power," *id.,* at 1149, and incongruent with the judicial function.

Also, in *Bogle* we recognized that the branches of government were not designed to be hermetically sealed from each other and that some interdependence was necessary. We noted in that regard that an important consideration in evaluating a separation of powers issue was the potential for disruption of a branch's constitutionally assigned function and whether that impact is justified by an overriding need to promote objectives within the authority of the coordinate branch. *See Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). The Ethics in Government Act was premised in substantial part on the perceived need for a prosecutor independent of the Executive Branch. By contrast, in considering the Act, we could find no overriding need for judges to act in concert with the executive in performing what is fundamentally a legislative function. *Bogle, supra,* at 1155. Indeed, the Government has failed to cite us to any overriding need that would justify calling upon judges and the judiciary to perform the task of promulgating broad-based rules of punishment covering all federal crimes. We do not read *Morrison* as altering in any way the mode of analysis that we employed in *Bogle.* Finally, cases construing the Guidelines that have been decided after the *Morrison* decision provide no real guidance on this issue. *Compare United States v. Serpa,* 688 F.Supp. 1398 (D.Neb.1988) (Guidelines unconstitutional) *and United*

*States v. Sumpter,* 690 F.Supp. 1274 (S.D. N.Y.1988) (same) *with United States v. Whitfield,* 689 F.Supp. 954 (D.Minn.1988) (Guidelines constitutional) *and United States v. Seluk,* 691 F.Supp. 525 (D.Mass. 1988) (same).

Third, we turn to whether a denial of a stay in this matter would likely result in irreparable injury. It remains our view that the imposition of a stay would likely result in irreparable injury; however, that injury would be felt not by the applicant, but rather by some defendants. At the core of our ruling, is the belief that each defendant convicted of a federal crime is entitled to be sentenced under a system that passes constitutional muster. Moreover, a stay of this ruling would have a pronounced impact on the liberty interests of a number of defendants. Under the Guidelines, some defendants would be required to serve a relatively short term of imprisonment. Under pre-Guideline law, those defendants would be eligible for a term of probation. If we were to stay the effect of our ruling, some defendants would likely complete their sentence before the Supreme Court ruled on the constitutionality of the Guidelines. And, if the Supreme Court concluded that the Guidelines were unconstitutional, those defendants would have been incarcerated unnecessarily because, in some instances, a term of probation would have been imposed under the pre-Guideline law. The net result of a stay then could well be to cause a real number of defendants to suffer the concrete and irremedial harm of serving a period of incarceration of anywhere from six to twelve months that they otherwise would not serve.

Recognizing the apparent harm to at least some defendants, the United States proposes that in "unique cases where immediate sentencing under the guidelines would impose extraordinary hardships upon a particular defendant, exceptions on a case-by-case basis may be appropriate...." [United States' Brief at 10–11]. This suggestion undermines the very uni-

formity that the Government purports to seek by this motion. Moreover, the recognition that at least some sentences should be imposed under pre-Guideline law would require, in effect, that the district utilize a dual sentencing system. Our probation department would then be required to prepare two pre-sentence reports—one under the Guidelines and another under the pre-Guideline law. Because of the profound administrative difficulty such a system would create, we considered and rejected adopting such a plan. We are unpersuaded that the Government has made a sufficiently compelling showing of harm to require the probation department and this Court to bear the heavy burden and necessary time delays arising out of the creation of a dual sentencing system, before a final ruling is rendered by the Supreme Court.

In spite of all of this, the Government claims that sentencing under pre-Guideline law "will raise a host of vexing problems that will add immeasurably to this Court's already heavy workload." [United States' Brief at 8]. The Government contends that the transition from a Guideline system to a non-Guideline system will be easier administratively than the opposite scenario. Apparently, this position is based on the contention that under the Guidelines the sentencing court is required to make specific findings of facts and law, including in appropriate cases the amount of drugs involved, the presence of weapons, the extent of harm, and the role of the defendant in the offense. The Government maintains that "[t]his may necessitate the holding of sentencing hearings and other proceedings at a point when memories are not as fresh and witnesses are not available." [United States' Brief at 9]. We are not persuaded by this argument. On a case-by-case basis,

evidence could be taken, testimony preserved and, where necessary, factual findings could be made as to a particular matter upon the specific application of either party at the sentencing hearing. The simple answer to the Government's concern about dimming memories would be to ask the Court to take testimony and thereby fully preserve the record. This resolution seems far more efficacious than to require some defendants to endure irreparable harm, or, in the interim, to require the utilization of cumbersome dual sentencing procedures in each case.[1]

The Government also argues that sentencing under pre-Guideline law prior to the ultimate resolution of the issue would have the practical effect of increasing the workload of the Court, although it cites to no record evidence in support of this claim. In fact, our review of the available statistical data indicates that both the number of pleas and number of trials *increased* in July 1988 from the preceding month. Moreover, a statistical review of the disposition of all defendants charged with crimes in this district between the beginning of November 1987 and the end of July 1988 reveals that approximately 30% of the dispositions were generated as a result of trials and 70% by pleas of guilty. There were a total of 1,542 dispositions during this period—1,093 by plea and 449 by trial. That nine month average—or 29% trial rate —is mirrored by the actual figures derived in the month of July 1988. In that month, 64 criminal trials occurred and 152 pleas of guilty were taken for a trial rate of 29.6%. And if we were to compare the ratio of pleas to trials in July 1987 and July 1988, we would find that the trial rate has remained about the same—29.5% disposed of

---

1. For example, in the *Bogle* case, under the Guideline analysis, three fact issues were placed in controversy by the parties: whether the Defendant was a minor or minimal participant; whether the Defendant obstructed justice; and whether the Defendant accepted responsibility for her actions. The Court held a hearing and took all evidence relevant to these issues. Subsequently, the Court ruled *en banc* that the Guidelines were unconstitutional and would not be applied in the district. Nevertheless, at Bogle's sentencing, the Court made a finding of fact pursuant to Rule 32 of the Federal Rules of Criminal Procedure that the Defendant had obstructed justice, and that the Government had met its burden as to that matter. The Court made clear at that time that pursuant to Rule 32, the parties were entitled to a finding of fact as to any issue deemed material. Should the Guidelines be upheld, a full factual record *already* exists and no additional hearings will be required in order to make the additional findings and to sentence this Defendant under the Guidelines.

by trials and 70.5% disposed of by pleas of guilty. In short, we can find no statistical basis for the claim that the disposition of cases by plea has or would decrease as a consequence of sentencing under pre-Guideline law until the Supreme Court rules.[2]

■ In support of its application for a stay, the Government additionally stresses the need for uniformity in the imposition of sentences. The gravamen of the Government's claim is that "[u]nless a stay is granted to establish uniform compliance with the existing statute until a definitive resolution is made by the Supreme Court, the result will be increasing hardship on the lower courts, the government, and criminal defendants." [United States' Brief at 4]. Our decision to rule *en banc* evinced this Court's concern for uniformity and the avoidance of the imposition of disparate sentences. The imposition of non-Guideline sentences *do* provide intradistrict uniformity. To the extent the Government seeks national uniformity in sentencing, given the wide range of holdings on this issue throughout the nation, a stay here would have absolutely no impact because our sentencing procedure would nonetheless conflict with some districts and be in harmony with others. Only a stay is-

sued by the Supreme Court could effect national uniformity before its decision is rendered.

■ The Government also contends that should the Supreme Court find the Guidelines unconstitutional, it will be easier and more efficient to change from a system of sentencing under the Guidelines to a non-Guideline system. We disagree. First, we reemphasize our overriding concern of the potential for irreparable injury some defendants might suffer if a stay were entered. Second, we underline again the practical problems and delays arising out of making such a change now. Third, imposition of sentences under the pre-Guideline system during this interim period, does not cause an irreparable injury to the Government because the Government may properly secure its interests simply by taking an appeal from those sentences that in fact deviate from the Guidelines. *See* 18 U.S.C. § 3742(b). Furthermore, the United States has contended, with some force, that resentencing under the Guidelines will not present a successful double jeopardy challenge. [United States' Brief at 8 *citing Pennsylvania v. Goldhamer*, 474 U.S. 28, 106 S.Ct. 353, 354, 88 L.Ed.2d 183 (1985); *United States v. DiFrancesco*, 449 U.S.

2.

### COMPARISON OF PLEA AND TRIAL ACTIVITY IN THE SOUTHERN DISTRICT OF FLORIDA NOVEMBER 1987 THROUGH JULY 1988

| MONTH | TOTAL DISPOSITIONS | PLEAS | PERCENT | TRIALS | PERCENT |
|---|---|---|---|---|---|
| NOV | 169 | 124 | 73.3 | 45 | 26.6 |
| DEC | 190 | 142 | 74.7 | 48 | 25.2 |
| JAN | 156 | 116 | 74.3 | 40 | 25.6 |
| FEB | 168 | 115 | 68.4 | 53 | 31.5 |
| MAR | 194 | 122 | 62.8 | 72 | 37.1 |
| APR | 164 | 106 | 64.6 | 58 | 35.3 |
| MAY | 113 | 85 | 75.2 | 28 | 24.7 |
| JUN | 172 | 131 | 76.1 | 41 | 23.8 |
| JUL | 216 | 152 | 70.3 | 64 | 29.6 |
| TOTALS | 1,542 | 1,093 | 70.8 | 449 | 29.1 |
| MEAN | 171 | 121 | 71.0 | 50 | 28.8 |
| MEDIAN | 169 | 122 | 73.3 | 48 | 26.6 |

### COMPARISON OF PLEA AND TRIAL ACTIVITY JULY—1986, 1987 AND 1988

| | JULY 1986 | JULY 1987 | JULY 1988 |
|---|---|---|---|
| TOTAL DISPOSITIONS | 224 | 166 | 216 |
| PLEAS | 176 | 117 | 152 |
| PLEAS AS A PERCENT OF DISPOSITIONS | 78.5 | 70.4 | 70.3 |
| TRIALS | 48 | 49 | 64 |
| TRIALS AS A PERCENT OF DISPOSITIONS | 21.4 | 29.5 | 29.6 |

117, 134–37, 101 S.Ct. 426, 435–38, 66 L.Ed. 2d 328 (1980)].

We add that the cases cited to us by the Government where a stay had been granted pending Supreme Court review notably have not arisen in circumstances where the stay order caused a continued deprivation of one's liberty interests. *See, e.g., Bowen v. Kendrick,* —— U.S. ——, 108 S.Ct. 1, 97 L.Ed.2d 787 (1987) (Rehnquist, Circuit Justice) (stay granted of order enjoining the enforcement of parts of Adolescent Family Life Act); *Rostker v. Goldberg,* 448 U.S. 1306, 101 S.Ct. 1, 65 L.Ed.2d 1098 (1980) (Brennan, Circuit Justice) (stay granted of order invalidating registration requirements of the Military Selective Service Act); *Houchins v. KQED, Inc.,* 429 U.S. 1341, 97 S.Ct. 773, 50 L.Ed.2d 733 (1977) (Rehnquist, Circuit Judge) (stay granted as to injunctive relief affording media access to prison); *Republican State Central Committee of Arizona v. Ripon Society, Inc.,* 409 U.S. 1222, 93 S.Ct. 1475, 34 L.Ed. 2d 717 (1972) (Rehnquist, Circuit Justice) (stay from injunction prohibiting political party from adopting certain mode of allocating delegates). A stay of a ruling that finds an Act of Congress unconstitutional obviously works a hardship to one of the parties who must continue to operate under an "unconstitutional system." However, the administration of justice is not always prompt and litigants must normally expect some delay in the ultimate resolution of the controversy. In most instances this delay cost is one our society is willing to bear. Here, by granting a stay we would be exacting the price of the unnecessary incarceration of a certain group of defendants. We do not read the law to require the party prevailing in the lower court to endure an unquestionably irreparable injury until a final disposition may be obtained.

The Government cites the case of *White v. Weiser,* 412 U.S. 783, 788–89, 93 S.Ct. 2348, 2351–52, 37 L.Ed.2d 335 (1973), where the Supreme Court stayed an order declaring unconstitutional a congressional redistricting plan of Texas. Pursuant to that stay, "[t]he 1972 congressional elections were conducted under [that] plan...." *White,* 412 U.S. at 789, 93 S.Ct. at 2351.

The effect of allowing an election to proceed based on an improper apportionment scheme is wholly unlike the effect a stay would have in the present cases. Important constitutional rights were, of course, at stake in *White.* However, the issuance of a stay in that case did not effect the liberty interests of the "prevailing" parties. *See also Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) (stay of district court order allows election to go forward under an unconstitutional reapportionment scheme). The Government also cites to *Marathon Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 88–89, 102 S.Ct. 2858, 2880–2881, 73 L.Ed.2d 598 (1982) where the Supreme Court found the jurisdictional grant to the bankruptcy courts unconstitutional. In that case the Supreme Court issued a stay of judgment which was intended to "afford Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication without impairing the interim administration of the bankruptcy laws." *Id.* at 88, 102 S.Ct. at 2880 (citations omitted). We emphasize that that stay did not have the effect of exacting punishment upon certain individuals as a result of the mandate. Indeed, the rationale underlying the issuance of a stay in *Marathon* is, we think, wholly inapposite to the issues before this Court.

An examination of still other cases addressing the stay issue is instructive. In *Certain Named and Unnamed Non–Citizen Children and Their Parents v. Texas,* 448 U.S. 1327, 101 S.Ct. 12, 65 L.Ed.2d 1151 (1980) (Powell, Circuit Justice), the district court found unconstitutional on Equal Protection grounds a Texas statute that "prohibit[ed] the use of state funds to educate alien children who are not 'legally admitted' to the United States...." *Id.* at 1327, 101 S.Ct. at 13. The court enjoined the State from denying free public education to otherwise eligible children because of their immigration status. The district court denied a motion to stay this ruling, but the Court of Appeals for the Fifth Circuit granted a stay. Justice Powell, however, took the extraordinary step of vacating the

stay entered by the Circuit, finding that the harm caused by the lack of education was indeed irreparable. *Id.* at 1332–33, 101 S.Ct. at 15–16. Justice Powell was unpersuaded by the State's position that a stay would cause minimal harm to the applicants since the children had been out of school for five years, and another year would not add to the harm. *Id.* at 1333, 101 S.Ct. at 16. Clearly, the effect of a stay in that case would have been to require the prevailing party to endure irremedial hardship while the litigation on the merits went forward. Similarly in this case, we believe a stay would probably work an irremedial hardship on the prevailing party. *See also Araneta v. United States,* 478 U.S. 1301, 107 S.Ct. 1, 92 L.Ed. 2d 751 (1986) (Burger, Circuit Justice) (stay granted where denial of stay and resultant compelled disclosures could lead to prosecution abroad); *In re Roche,* 448 U.S. 1312, 101 S.Ct. 4, 65 L.Ed.2d 1103 (1980) (Brennan, Circuit Justice) (stay of contempt proceeding where reporter would be required to face commitment to jail or disclosure of confidential information); *Heart of Atlanta Motel v. United States,* 85 S.Ct. 1, 13 L.Ed.2d 12 (1964) (Black, J.) (denial of stay of enforcement of Civil Rights Act of 1964).

On balance, the Government's application for a stay must be denied. In sum, we do not believe that the applicant has a reasonable probability of prevailing on the merits in the Supreme Court. Moreover, the Government has not convinced us that it will suffer any irreparable injury by the denial of a stay. Finally, in balancing the equities, the potentially unnecessary deprivation of a liberty interest upon a class of defendants by the imposition of a stay, as well as the substantial administrative burdens associated with an interim dual sentencing system, or the return now to Guideline sentencing, heavily militate against granting the Government's motion. Moreover, we note that of the approximately 130 cases in which the Guidelines have been held unconstitutional, we are aware of only three courts that have stayed the effect of their decision. *See United States v. Brown,* 690 F.Supp. 1423 (E.D.Pa.1988);

*United States v. Brodie,* 686 F.Supp. 941 (D.D.C.1988); *United States v. Bolding,* 683 F.Supp. 1003 (D.Md.1988) (*en banc*).

## II. SEVERABILITY

In our June 30, 1988 Order, we ruled that the provisions of the Act which eliminated parole, Pub.L. No. 98–473, title II, §§ 218(a)(5), 235(b)(1)(A), 98 Stat. 1976, 2027, 2032 (1984) were not severable from the Guidelines and therefore those provisions were inapplicable to any sentences imposed in this district from the date of the Order. On the other hand, we found that the provisions concerning "good time" credits, 18 U.S.C. § 3624(b) were severable from the Guidelines and would be applicable to the sentences imposed. In reaching these conclusions, we recognized that

> [t]he standard for determining the severability of an unconstitutional provision is well established: " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " *Buckley v. Valeo,* 424 U.S. 1, 108 [96 S.Ct. 612, 677, 46 L.Ed.2d 659] (1976) (*per curiam*), quoting *Champlin Refining Co. v. Corporation Commission of Oklahoma,* 286 U.S. 210, 234 [52 S.Ct. 559, 564, 76 L.Ed. 1062] (1932).

*Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987).

### A. Parole Commission

The central purposes of the Act were the establishment of honesty in sentencing by the imposition of real time sentences, as well as the avoidance of disparities in sentences imposed for similar crimes. "The bill's sweeping provisions are designed to structure judicial sentencing discretion, eliminate indeterminate sentencing, phase out parole release, and make criminal sentencing fairer and more certain." S.Rep. No. 225, 98th Cong., 2d Sess. 65 *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3248 [hereinafter S.Rep. 225]. Obvi-

ously, the implementation of the Guidelines was the cornerstone of the proposed system. They severely restricted the discretion afforded the sentencing judge and virtually guaranteed that defendants with similar criminal histories and "offense characteristics" would be sentenced to similar terms.

Under pre-Guideline law, a major purpose of the Parole Commission was to act as a leveling force upon the disparate sentences actually imposed by judges exercising their discretion within the wide sentencing range created by Congress. As the Supreme Court observed: "Congress has decided that the [Parole] Commission is in the best position to determine when release is appropriate, and in doing so, to moderate the disparities in the sentencing practices of individual judges." *United States v. Addonizio*, 442 U.S. 178, 189, 99 S.Ct. 2235, 2242, 60 L.Ed.2d 805 (1979). By promulgating the Act, Congress, quite simply, meant to create a new leveling force by creating the Guidelines and eliminating parole. *See* S.Rep. 225 at 53 & n. 74, p. 3236. "[I]n a guidelines sentencing system, no useful purpose will be served by continuing the [Parole] Commission. Prison sentences imposed will represent the actual time to be served and the prisoner and the public will know when offenders will be released from prison." *Id.* at 56, p. 3239.

■ It is indisputable that creation of a Guideline system of determinate sentencing and the elimination of parole were acts inextricably related. To abolish the Guideline system and yet find that the elimination of parole was severable would be to exacerbate the very problem of disparity in sentencing that Congress sought to remedy by the Act. Without the constraints imposed by the Guidelines, judges would again be able to impose sentences within a wide range. However, if there existed no possibility of parole, the differences in the actual time served for similar crimes could be even greater than that which obtained under pre-Guideline law. Of course, this system would nonetheless further the "truth-in-sentencing" concept of the Act, but it would totally forfeit the goal of

uniformity. Both parties agree that this result would be contrary to the intent of the legislature, and that Congress would not have eliminated the Parole Commission, absent the adoption of the Guideline system. Accordingly, these provisions are not severable from the Guidelines, and sentences imposed in this district will be based on the availability of parole.

### B. *Good Time Credits*

■ As part of the effort to promote honesty in sentencing and the avoidance of disparity for time served, the Act also alters the manner in which prisoners may earn time toward an early release. 18 U.S. C. § 3624(b). Prior to the Act, prisoners were eligible to earn good time credits toward their release at rates that varied according to the length of the prison term. Prisoners with relatively short sentences, of six months to one year, could earn five days per month toward release, while those with long sentences of ten years or more were eligible to earn up to ten days per month. Moreover, those good time credits were subject to forfeiture at any time.

As amended, this section allows a prisoner to gain fifty-four days of good time credit a year after the first year of imprisonment. This fixed period is consonant with the purposes of honesty and uniformity in sentencing that underlie the Act. However, there are other provisions that indicate that the Congressional intent in enacting these measures went beyond these goals. First, good time credit will not be awarded if the prisoner "has not satisfactorily complied with such institutional disciplinary regulations as have been approved by the Attorney General and issued to the prisoner." *Id.* Accordingly, the prisoner will be put on notice as to specifically what conduct may result in the failure to earn credit toward early release. S.Rep. 225 at 147, p. 3330. Second, the new section provides that good time credit "vests at the time it is received. Credit that has vested may not later be withdrawn...." 18 U.S.C. § 3624(b). Therefore, only one year's worth of credit can be forfeited for a violation of prison rules. S.Rep. 225 at 147, p. 3330. The earlier law

"permit[ed] forfeiture or withholding of any amount of good time that [had] been earned up to the time of the forfeiture withholding...." *Id.*

These new provisions work independently of the Guidelines. While prisoners may be eligible to gain less time toward early release under this subsection, that determination is clearly one for Congress and may be made whether it is implemented within a determinate or indeterminate sentencing system. Further, Congress stated that the new provisions would be "considerably less complicated" to compute, *id.*, at 146, p. 3329, and easier and probably cheaper to administer. *Id.* at 147, p. 3330. Also, the certainty regarding the credits actually earned, and the notice provisions regarding disciplinary regulations were viewed as having a positive effect on prisoner morale and discipline. *Id.*

In sum, the new "good time" provisions contained in 18 U.S.C. section 3624(b) work to promote the objectives of the Act of honesty and uniformity in sentencing, independent of the Guidelines. Moreover, this subsection contains other changes to the system which are unrelated to sentencing factors but are meant to affect prison administration and environment. We find that these are goals that Congress would seek to address independent of the Guidelines.

The lack of a severability clause, and the uniform effective dates of the Guidelines and good time provisions provide some support for the notion that the good time credits were meant to operate within the Guideline system. Undoubtedly that is true, however, our duty is "to maintain the act so far as it is valid," *Brock*, 107 S.Ct. at 1480, and these factors standing alone do not persuade us that Congress would not have enacted these provisions independently of the Guidelines. Accordingly, this provision is severable and sentences imposed in this district will be subject to the good time provision as contained in the Act.